Isaac Howell for the Wilderness LLC. In this case, the district court granted a natural gas company a prohibitory injunction against a private landowner, the Wilderness LLC, who we represent, in a condemnation action, and it was based on one justification, only one justification in the record for that injunction. That was to avoid irreparable harm. The gas company had to clear all of the trees on the property by March 14th. The testimony was that they needed to access the property by March 1st, and they needed to complete cutting all of the trees March 14th. This was for a hearing on February 26th and 27th. So it was a request on Monday and Tuesday that access be granted by Thursday to begin cutting trees, and all of the asserted harm came from the tree cut, flowed from missing the tree cutting deadline. Now, here on appeal, ACP agrees that that deadline did not apply to the Wilderness, that they cannot cut the trees today, and that they could not cut the trees that week, you know, on February 26th, that they were not... Have they cut any trees? I'm sorry? Have they removed any trees, or cut any trees down, I guess? No, Your Honor. They have not cut the trees. There's no trees? Zero trees have been cut. Have they entered? No. What happened, well, I got a call after, when we were briefing this day, I got calls that tree cutting was about to commence. One from a gentleman from McGuire Woods, and one from Doyle Land Services, saying tree cutting is starting tomorrow, or tree cutting is starting today. And then I shared the letter, the March 8th letter, that this court has admitted that says that FERC is still looking at how to reduce the number of trees cut, and then... You mean the FERC letter? Yes, sir, the FERC letter. Information request, you call it? The information request, yes, Your Honor. And that letter says, it actually repeats a lot of what we were saying at the district court hearing, that the decisions have not been made about which trees to cut. FERC has not authorized the cutting, the location has not been authorized, the width of the right-of-way has not been decided upon, so they do not know which trees to cut, as a matter of the FERC certificate. Not as a matter of something ancillary to the Natural Gas Act, as a matter of their own certificate. They do not know which trees to cut. And that information request, the information request was March 8th, I believe it was March 8th, that the calls came saying, we are, you know, we're going to enter the property, and we're going to cut. And the district court opinion allows them to cut 125 feet foot wide. That's the right-of-way? It's both, yes, Your Honor, it's both the permanent and the temporary right-of-way. They plan to cut, you know, it's one swath, 125 feet wide, and roughly two miles long on the wilderness property. It takes two miles to get through the farm? I believe it's almost two miles, Your Honor. Yes, sir. So it's a 125-foot piece of land that's two miles long? Well that's what the easement width would be. I understand. Is that how they get to the, that's how you get to 27 acres? Or 28 acres? Yes, Your Honor, I believe to the 27- Sometimes it says 27.85, and other places I've read 27, 28.75. Do you know which one's right? I believe it's 28.75, and yes, that would be the sum of the temporary easement and the permanent easement, a 50-foot wide permanent easement, and the remainder being a temporary construction easement. But they intend to cut- The construction easement's 125 feet, and the permanent easement's at 50 feet? No, Your Honor, the 125 is the sum of the two, of both permanent and temporary. So you're looking at 50 for permanent and 75 for temporary. You add them together, you get the 125. So, but missing that tree clearing deadline was the foundation, it is clearly the foundation of the district court's opinion. The district court, when it gets to the injunction section, says the reason for this is the March 14th deadline. And when it gets to the irreparable harm analysis, it mentions the March 14th deadline. And when it gets to the asserted harms, financial harms due to delay, it's due to the March 14th deadline. And then even when- But it's already expired. It's come and gone, yes, sir. All right, you said they haven't cut any trees. So what do you want us to do now? Well, our request is that the injunction be vacated. It's based on the foundation. Our request is that the district court injunction be vacated because it was based on a principle- They think we're going to let them go ahead and cut those trees? I'm sorry, your honor? It didn't expire under its own weight? No, it's a standing- It applies today. They can still go and cut the tree? Yes, if they went on today, they would have a- I might be able to show them the briefing in this case to tell the sheriff or the sheriff deputy that the cutting can't happen. But they would have the district court's order saying that it depicts that 125-foot swap. It depicts it and says that they can come on to do exactly what they told the district court that they intended to do. Is the right-of-way, that is the route, 125-foot right-of-way fixed? No, sir. That is the point of the appeal. Well, but you got that- You gave us that letter, which was not before Judge Moot. That's correct, your honor. It hadn't been- March the 8th. Yes. And in the appendix or exhibit to it, whatever it's called, exhibit enclosure A, paragraph 5D says, evaluate- This is what a pipeline company, I guess, is supposed to do. Evaluate how Atlantic could reduce the width of the construction and permanent rights-of-way and thus the number of trees cut. Yes, sir. Have they done that, do you know of? To my knowledge, they have not responded to that letter. Okay. So, but what that letter- Is that your point, that the rights-of-way and the construction and permanent rights-of-way and the number of trees to be cut are up in the air? Not only that, but until they satisfy FERC, they can't cut a single tree. They do not have FERC permission to do so. And this all ties back to the paragraph in the FERC certificate. Well, why do we need to do anything? Well, I think what the court's choice here is, is either to modify this injunction. I think that's really what ACP is asking for. They're saying that, yeah, we can't get on and cut trees, but we can get on to do other things. And our point is, there's no evidence about this new motion that they're making. On their brief, they say, well, we could do other things. We could do the archaeological survey and we could do other things. But the record is, there was one justification. It was tree cutting. The only evidence the court heard, the district court, was that all this harm was going to happen if that deadline came and went. Our clients didn't make the deadline come and go. They never had FERC permission, even that week, to cut a single tree, as the March 8th letter illustrates. And it all ties back to the certificate itself. Paragraph 267 of the certificate states, this is a historic property. Is that in this appendix? Yes, sir, I believe that. Do you know what page it is? I do not. I apologize. But you're saying it's paragraph 267? Yes, sir. Paragraph 267 of the FERC certificate. That deals with the Wilderness Farm? It does. It deals with another property or two as well. But it deals with the Wilderness Farm. And so that's the, it's the complete certificate. It is not, you know, a letter coming out of certificate. That is the order of FERC. And at paragraph 267, it states that the process is not over. It talks about ongoing activities to protect the historic resources. And that was, and that FERC certificate is dated, what, February the 1st? No, sir, it's from October of 2017. So that's been around a while. I believe it was October 13th of 2017 that that came out. But then the wilderness wasn't sued until February of this year. But the certificate, that, so it's on the National Register of Historic Places, the wildernesses. It's on the State Register of Historic Places. So there's obligations, legal obligations under section 106. How big is this farm? The whole property is a thousand acres. Thousand acres? Yes, sir. In the, on the Calpester River? No, that's called, it's called Mill Creek is the creek there. That goes into the Calpester River. Yes, sir. Yes, sir, it does. It's a... Calpester River watershed. Yeah, I believe it is the same watershed. This is called the Deerfield Valley. There's a little village called Deerfield, Virginia. And this is, but the creek that goes through the wilderness is actually called Mill Creek. But I think, I think the court is correct about the, about the watershed. Yes, sir. In any event, the protection flows from the certificate itself, from the National Historic Preservation Act and says, ACP, you are not done with this process. It says ongoing activities must be completed before construction, must be completed before construction. But you all disagree on what construction is. It looks to me like from reading your paper. Well, I think we, well... You're like ships in the night. Well, I think that their argument is that construction doesn't mean tree clearing. But then why are they saying that they can't clear trees? There's only one reason. So that March 8th letter makes clear, they're still deciding which trees to cut and where. But the programmatic agreement, which is an agreement with, between ACP, the pipeline company, and FERC, says that construction, it's a defined term. Construction is a defined term in the programmatic agreement, which ACP has signed. And it says... Programming the group. I'm sorry. Who's in, who's part of that agreement? Yes, sir. I will slow down on that. Various agencies, various agencies, but I would say the main signatories for our purposes here is FERC. FERC signed it. And ACP signed it. It's a programmatic agreement about protecting historic resources. With various federal agencies? Various. I believe Fish and Wildlife has signed it. And I believe that the, you know, the state, the Virginia Department of Historic Resources... State agencies too. State agencies too. They have a role in the historic mitigation. So they all came together on this document. And what does that document say? One of the things it says on page four is that construction includes the clearing of trees and vegetation. Now that is completely consistent with the March 8th letter. And it is completely consistent, even with their admission here before the court today, that they can't cut trees. But didn't Judge Moon think that it was... That was not part of... He thought that was pre-construction. Judge Moon accepted the argument that construction is... That the tree felling is pre-construction. Yes, Your Honor. Yes. And we would... We submit that that's a legal question. The definition of the term construction in this context. And believe that they are bound by what they signed as to... With the agency. It's not just some other document that defines construction. That's the document that governs the management of this exact property. And now they make an argument that on their reply brief that tree felling is different from tree clearing. But there's, as I recall, no authority cited for that proposition. Is that defined anywhere? Tree felling and tree clearing? In the reply brief, it's defined. No, I saw it in the reply brief. But was it defined in any of the papers leading up to this? No, Your Honor. I'm not aware of any record of making that distinction between those two. Has this timber ever been cut over? No, sir. The testimony at the hearing was from Mr. Koontz, who lives there with his wife, Mrs. Koontz, is that it has not been timbered. Is most of it woodland or is there some pasture land? There's some pasture land. I would say that more than 50% of it is wooded. And that is an important point because what the State Historical Department decided was that the whole property is historic. Not... I mean, there's a beautiful home there and it's, you know, the heart of the property. But what the State Historical Department decided was this entire 1,000 acres is historic. These farm fields, these forests, every inch of this is a part of the working farm and is subject to the historical protection. I see my time is up and I reserve the rest for rebuttal. So, thank you. Thank you, counsel. Mr. Hatch. May it please the court, Ben Hatch. I hate to jump on you right from the get-go, but let me just tell you that while you're doing your argument, one of the things I'm thinking is, why is this case being worked out? I mean, it just seems to me that it's ripe for resolution, not by order of the court, but by agreement of the party. So, just keep that in the back of your mind while you're arguing. Thank you, Judge Fatcher. Good question and I'll try to address that. But let me begin just by saying, may it please the court, on behalf of Atlantic Coast Pipeline, I want to thank the court for its expeditious consideration of this matter. As the court knows, this arises to the court because Atlantic is constructing the Atlantic Coast Pipeline, which is a very significant interstate natural gas pipeline stretching from West Virginia to North Carolina. Now, there's also eminent domain proceedings that are instituted and ongoing in the states that are affected by the pipeline where agreements could not be reached out with respect to easements privately. And so, those proceedings are ongoing and, of course, those proceedings will take some time as just compensation is determined. But what has not taken time, as this case demonstrates, is the determination that Atlantic has sought an easement, which FERC has approved, over the exact route that FERC has approved. It hasn't approved the exact route, according to this letter that they sent last week. It says, evaluate how Atlantic could reduce the width of the construction and permanent rights away, and thus the number of trees cut. Well, and, Your Honor, to be clear, FERC has approved the route of the pipeline, the entire route, and it also- You said exact route, and I'm talking about on the wilderness farm. That's all we got here. This thing is 600 miles, you said, from the Ohio River down into North Carolina, but we got two miles, though, he said. And let me get to the wilderness, but just at a broader level, Your Honor, as I get to that, the district court was very clear in handling these matters and the injunction in the access entry order he entered is very clear that the access is only to the FERC approved routes and easements that are in the FERC approved route of easements, and that all exists. FERC can, and I want to get to the letter, but FERC can, of course, ask for additional information as it goes. There are conditions that Atlantic is in the process of satisfying, but there is a route, and there are easements on that route, and those were entered in evidence at the hearing, and that was the subject of the partial summary judgment order that is not subject to appeal. So the easement is on a route that FERC has approved. The letter, to get, Judge King, to your question about the letter, the letter that came out on March 8, I think, Mr. Howell, does clarify what FERC wants in terms of further consideration as it relates to the wilderness, and it touched on some other properties as well. But I think it's very important. The only part of it that I found that was related to the wilderness was that paragraph number 5 in the enclosure. That's page 3, paragraph 5. That's specifically what they're asking you all to do. That's right, Your Honor. Mr. Hatch, your client has a summary judgment. My question is very specific. What is it that ACP wants to do now that it needs this injunction? Thank you. Yes, Chief Judge Gregory. What we want to do now... I mean, day one. I mean, like, you had it today. What you want to be able to do tomorrow? Yes, sir. Go ahead. What we want to be able to do, this letter that I was just addressing, the March 8 letter, in the paragraph 5 lists several additional examinations and considerations that FERC has directed. But you want to do what's in that letter, March 9 letter, correct? Yes, Your Honor. Now, can you, as your position, can you cut, clear, however you want to describe what you do to a tree before you complete everything in that letter? Our position, Your Honor, is we're going to do the things that FERC has asked in this letter and give them the information that they have asked for. And we would like to do that as soon as we can get the access order back. So you're representing this court that you are going to do those things and get FERC's clearance, or however you want to call it, permission, or whatever, before you cut tree one? We will not cut trees until FERC approves our tree cutting. And I answer it that way. We're going to do these things, Your Honor. I can't say what FERC ultimately... All right. You know, they may say, OK, we've looked at all this. Now you can cut trees. They may say, OK, you did these things. You can cut trees now. Come back later. So I want to be clear. We're not going to cut trees until FERC says you're approved to cut trees on the wilderness property. OK? And we also want to get access to do this information that FERC has asked for, that it clearly relates to considerations. Now Virginia law will allow you to do that now, right? In 5649.01? No, Your Honor. It would not. And Mr. Allen, I've argued cases about that in the Virginia Supreme Court. And I don't believe that statute is a vehicle for the activity that we want to accomplish on the property. And the reason is that... Can you give me an EG? Yes, Your Honor. The reason is that that statute allows surveys and examinations for an interstate natural gas pipeline like ours. But it's restricted. It doesn't, for example, allow the introduction of mechanized equipment, barring agreement  to FERC. Would be trenching and would be things you would use a mechanized equipment for. And so that stands to your question. What we would do tomorrow if we could get our access order back, we'd get right to work on this. And I don't know if the court, this briefing came in quickly, but I wanted to make sure to highlight to the court, we have also petitioned to FERC for an extension of that tree felling time period. And the petition... Is that a waiver request? Yes, Your Honor. Is that in this record? It's... It was not... It happened subsequent to the proceedings below. I understand, but so did this letter. And it was submitted to us. And we supplemented the record with this letter. But you say that you requested a waiver, you say two or three times in your brief, on March the 15th. And I haven't seen the waiver request. And Your Honor, we're happy to follow up if you want to see that. It's on the electronic FERC docket. We put the website in our brief. I thought it was here somewhere, and I hadn't seen it. We had other cases today. And believe me, we've petitioned for the waiver. I don't know that the document... That's our request. FERC will decide. And you say you've petitioned for it, and you expect it to be granted. I'm optimistic that it was, first decision. But I'm optimistic it'll be granted. Which means that March 15th date would be set aside. But how come you all went down and told Judge Moon that you're going to go up there and cut all the trees off the place before March 14th? Well, and Your Honor, certainly the tree cutting was the immediate... And this is where I have to take some issue with my fellow counsel, that there was certainly that deadline impending was an immediate need for access to the various properties that were the subject of the hearing below. But that wasn't the only need to access, to go back to the answer to Chief Judge Gregory's question. We need access for all the various... But you got the injunction based on the assertion that that was what you needed. And that's what the judge relied on. And that's what first came up here on the State Park. And now you've moved your position, substantially, it seems to me. Well, our position has always been that we need the access order, and then we do whatever FERC tells us to do. They're the regulator. And Mr. Wright testified, actually on cross from Wilderness Council, that we want this order to go do all the things that FERC allows us to do. And the things that FERC doesn't allow us to do, if there's conditions related to construction that haven't been satisfied yet, we wait till FERC... He said he had to cut the trees by March 14th, and he didn't know it was a historic property. That was in his testimony. And he's the project manager for the overall project. But this, again, goes to there's one... There's the access, which flows from the eminent domain proceedings. But that just gives you the ability to go onto the property to do the things that FERC has allowed you to do. And at the time of the hearing, Judge King, all FERC said, and you had asked about the appendix at page 127, Your Honor. Thank you. And all that the certificate had as a condition, this is... The hearing was before this letter of the 8th. All the certificate had was it said you need to consider mitigation plans prior to construction. And as we lay out in our brief, our interpretation is that tree felling, and this wasn't really the focus of the hearing, but tree felling versus tree clearing is not construction activity. And so on the face of the FERC certificate, it said, you know, come up with mitigation plan prior to construction. And so our position was not inconsistent with that. Subsequently, we have this letter of the 8th. And I think that makes it clear FERC wants some additional things done and not moving the route, not changing the easement, but whether it can be narrowed. And clearer than that is before felling. Yes. And so having this letter, which arose after the hearing below, we take the position in light of what FERC has said, we're not cutting trees until FERC tells us we can cut trees. As far as we know, Judge Moon never seen this letter. As far as I... It came up after the hearing below. Now, of course, there's ongoing proceedings. Right. But I want to make sure I get back to what Judge Traxler asked me at the outset. And, of course, there's the record below said about 80% of the needed easements have been secured through agreement among the parties outside of court. So obviously, there's an overarching interest and not burdening the courts and seeking private agreement. And in this case, you know, the route has to be the route that covers their land. And certainly, there's additional information that FERC needs. But if the difference between the parties is a little thing, or if it's a change in the route, that can make it difficult to reach agreement. And so here, this is... But is that something we don't know right now? We don't know that, Your Honor. I'm just trying to give you a sense. You know, certainly, we want to work it out. But we need... There are deadlines. There is a schedule we need to keep to. And we need access to do, as I was saying, the types of examinations... You need access to do these archaeological studies? Yes, Your Honor. I mean, that's in that FERC letter. I would say that's the primary thing. There's several. Archaeological studies related to the role of slaves in the operation of the farm. And there's a prehistoric archaeological site on the Wilderness Farm property that requires testing and mitigation. You're supposed to work on that? Yes, Your Honor. And plus the stuff about the width of the construction. I was curious, at mileposts, what are the mileposts there? They start counting up there at Ohio River, right? Probably so. And Your Honor, I might be speaking a little out of school about the mileposts if I try to answer. I don't know specifically about the mileposts. Well, that's surely a record somewhere. You said it was 600 miles. Yes, Your Honor. And then they're just breaking it down through Virginia. I'm just curious where they are on the... Where this one is on that. I'd be happy to follow up, but I would be speculating if I tried to answer the mileposts as I stand here. Sorry. But anyway, the mileposts, they need to be added to figure two. That's one of the maps that's in there somewhere. Anyway. Yes, so there's several things in the letter. I would say the archaeological studies to Chief Judge Gregory's question, if we can get on tomorrow, we would be expeditiously conducting archaeological studies, gathering the data FERC asked for, submitting the data to FERC for its consideration. Meanwhile, we've asked for an extension of that tree felling deadline. And so, of course, it's ultimately up to FERC, but we need this... Why don't you all agree to amend the injunction to provide for all this? Well, Your Honor, and we tried to summarize in our brief, but I think that, of course, much of this litigation is resolved in the district courts. This court's had a couple of decisions, but not on this issue. But the injunctions allow access, because that's what flows from establishing the legal right to the easement, which we have established. That was the partial summary judgment. But I think the district courts wisely avoid saying, okay, you can go on if you do this and then FERC does that. The injunctions are supposed to be particularly prospective injunctions, or what do you call them, mandatory injunctions. They're supposed to be, as a general proposition, narrowly drawn and specific. It looks to me like you all got it, or you can understand it. You're telling us that you're not going to cut trees until you're entitled to cut trees. You can put in there that you're going to agree to what FERC tells you to agree with, and you're going to comply with their request in this letter. And you're going to seek a waiver, and you're going to keep the district court advised, and all this stuff. I don't know. Looks to me like I've been dropped. I'm following up on what Judge Strachter said. Huber talked in the generalities about trying to buy property, but it looks to me like that you all can sit down and agree to the terms of how you're going to deal with this thing. Or you wouldn't mind us blue penciling it, too, right? Well, Your Honor, I would argue against trying to blue pencil the injunction, and let me try to respond to that question. First of all, if you look at the injunction that the district court entered, which is- The injunction was based on the proposition you were going to go in there and cut the trees by March the 14th and finish it. And that's not what you did, and that's not really what you intended to do. And that troubles me. I've read this record pretty carefully. Well, and Your Honor, let me address that. We had that deadline looming. We needed to fell trees, and we had an order that said consider a mitigation plan prior to construction. And so we're trying to expeditiously move forward for all the reasons. And I would just say, if you look at our- You all could agree. I don't think you could agree, too, is what construction means. You've already agreed to it, according to Mr. Howe. But you're talking past each other when you're saying that cutting trees is pre-construction, when you've already signed an agreement with a bunch of agencies saying it's not. Well, again, that's tree clearing, which again, because this wasn't an issue below, but I believe tree clearing involves using mechanized equipment to get out the stump, take the tree away later in the pipeline. But the injunction, which is in the particular part I direct the court to, is at 461 of our appendix. And that injunction to whether it needs to be modified or not, it doesn't say go on and do tree clearing by the 14th. It doesn't say do this or do that. It says you have the right to access, and then it's also clear it's a right to access consistent with what FERC has authorized. And FERC, of course, is the regulator here. FERC controls this whole project. And so Atlantic is going to be responsive to FERC. This injunction grants it the ability to access the land to do what FERC authorizes it to do. And all I would say has happened since the hearing below is that FERC has made clear through this letter, which the court accepted, that it expects certain specific things. And in light of that letter, we plan to do those things. And we're not going to do tree felling or tree clearing, whatever. We don't need to debate it. The trees aren't going to be cut down until FERC has whatever it needs, whatever it decides, has decided that you can do the tree felling or tree clearing. And as an officer of the court and your counsel, you authorize your client to represent that to the court? Yes, Your Honor. Everyone abide by that? Yes, Your Honor. Mr. Hatchwell, obviously things have changed since you were in front of the district court. And now we're talking about, well, we can do this, we can't do that. And you know from your experience working on this court, it's awfully hard for us to micromanage details like this. It just seems to me that it would be easier if we, in light of the change in circumstances, send it back to the district judge and let him sit down and work out all these details. But as far as exactly what the injunctions are going to cover, what can be done, what can't be done. And tell me what your objection is, if you have one, to us, in light of the change of circumstances, sending it back to the district court to reassess the scope of any injunction in light of the changes. Well, certainly. And that option's available to the court. But I would argue against following that. And I understand that facts have developed, the deadline has been imposed, although we're trying to extend it. This letter's come in, and that's caused us to reassess on the tree felling position. But ultimately, what I think the district court said and was correct about is that here we identified four bases for irreparable harm in the motion and memorandum that we brought. And tree cutting was the third of those four. And so it was the immediate interest, but there were four bases for irreparable harm. And the district court found that we were successful. And I think it's very telling that in his decision, he said, and this is at 427 to 428, in addressing landowner arguments that, well, you can just wait till November, when the tree felling deadline comes back open again. You can wait till then and do your project. And he had this discussion at 427, 428, where he said, even if that's true, and even if the project could still be constructed on time, now is the appropriate time for the entry order. Because we don't know all the things that could come up, to your point, Judge Traxler. Whether FERC will take this and say, okay, I want to know one more thing before you can go on, whether this will be enough, that's FERC's process. It's iterative. It's responsive. Landowners can address FERC. And so we don't know what's going to come up. So if we have to keep going back to the district court and saying, okay, well, now we did this, and now FERC wants that, and now landowners take this, I just think it will really embroil the district court. It has embroiled it now. We're not in this business of telling people when to cut trees and when not to cut trees. But Judge Moon said, here on page 37 of his opinion, I don't know where it shows up in your thing, that ACP has demonstrated it would be harmed by not cutting down the trees that are on the now existing route before March 15th, because failure to cut those trees would significantly delay construction. And that's wrong. But I would think you had an obligation to go back there and correct it with him. You'd want to get down there and clear it up. And may I answer this question? Thank you. Your Honor, that was true at the time of this hearing. And certainly, we weren't misrepresenting anything to the court. There was that deadline. This hearing and the proceedings were back in March. But you're talking about you had to clear the plate, you had to get all the trees down by March the 15th. And we certainly proved that. And that fact existed. But we also proved additional bases for irreparable harm. And that's why I say this injunction is still properly predicated. It wasn't clearly erroneous. The district court's factual findings after extensive hearings. And it wasn't an abuse of discretion to issue the injunction. And we'll continue dealing with FERC. And the landowner will have a voice there. And we'll do what FERC tells us to do under the terms of this entry order. But the other three reasons. Now, we said the deadline, because you're not cutting trees, that's all. But the other three are clearly within your hands in terms of time. Because what you want to do now will determine how soon you can get started with pre-constructional construction, we'll call it. Correct? But they're in our hands if we're given access back, Your Honor. Yeah. So we have access. Right. They're in our hands to do the things, for example, that are in this letter. And then, of course, it'll go over to FERC to consider. And so it's not entirely in our hands. But the things that are in this letter, if we can get access, are in our hands to do. And we'll collect that information. And it'll go before FERC. And FERC will make whatever decision it makes. All right. Thank you, counsel. Thank you, Your Honors. Mr. Howell, you have quite a bit of minutes left. I thought I was sure Mr. Hatch would give me a lot to think about. I think Mr. Hatch's argument highlights Judge King's point. This is the motion to modify. These are things that were not before Judge Moon. This argument that other things justify entry. This argument that we need to get on to do the archaeological surveys. Yes, of course, Mr. Hatch can point to. I remember the cross-examination where the witness said that they could do other things, you know, pursuant to the entry. However, that was not offered as the justification for irreparable harm. I think what we have here is they've offered a justification. There's, we have the winter factors. You have to, it's a very high bar. This is an injunction in joining our clients. They have to prove likely, imminent, irreparable harm. They offered into evidence one justification for that. Tree clearing by March 15th. That is the thread that runs throughout the district court opinion. Now, they say it would be useful to go on the property to do other things. And just as an aside, the archaeological surveys are not an issue. Our clients want those to happen and I provided to my colleague, Mr. Holtheimer, dates. And today is one of them. Tomorrow is one of them. Friday is another one. And all of next week. So, you can't, I don't see why you would need an injunction to do what my clients have allowed to occur. They very much want an archaeological survey to happen. They want to understand what... Let's flip it on the other side. Why do you need one? An injunction? I mean, why do you need to keep them off from doing the things they need to do in first letter? Well, I think I'm, I'm not trying to keep them off. I thought you're trying to stop them from having access to the property now. I thought that's why we're here. Well, as I was saying earlier, I got calls saying, Mr. Howell, I'm just giving you a courtesy notification. The timber crews are going to cut your client's trees this morning. I know that, but let's talk about the present now. Present. Why don't you want them to be able to do everything FERC says in the March 9th letter now and not going to cut trees until they do? What's wrong with that? We, we want that. We want that. And so, but that's a... You'll give them access to do whatever they want to do except cut trees? Well, that's, that sounds pretty broad, but... Not pretty broad. That is pretty broad. That is pretty broad. But our view is that there is a mitigation process that is going through the FERC process. And we, and our clients want that to occur. But of course, it's, it's pointless. That's not in the letter. That's not in the letter. I'm sorry? In, in, nothing about mitigation in the letter? Yeah, the letter is carrying out the, it was part of the mitigation process. But that's what I'm saying. That's the process. Why don't you want them to start the process to comply with FERC? That's just a simple question. Yes, and my simple answer is yes, sir, we want it. And that's why we've given permission for it. That's why we, we've provided dates, including today, tomorrow. But you don't need to give permission. I mean, you know, in other words, so my point is that the domain is one of those places where, you know, the government has kept the imperial monarchy, you know, remnants in our constitution and FERC allows them to step in that way. We have something to say about it because normally, you know, condemnation has to occur with just compensation paid. But in the middle, we have this, the court's function in terms of whether or not you have immediate access. They have summary judgment already. So there's no question about the likelihood of succeeding. That's like, no question. That's not only is it likely, it's already been done. So at that point. It's not a subject. I mean, right. So what's left is whether or not they need to do these things before they cut trees. And I'm saying at this point now, why, if they're, you know, assuming now you may have doubts about it, but assuming you don't have any doubts, if they're going to be a company and lawyers of their word, why don't you want to start that now and do that? I do. I'm not opposing that. I think what they're asking the court to do is to say, take us at our word on our briefs, but leave the injunction unaffected. And just to modify it in some. How do you want us to modify it to make sure you're comfortable? Well, I think the appropriate thing to do, as I think Judge King suggested, is to let the district court hear evidence. All these things are things that I've read for the first time in Mr. Hatch's brief. All of these suggestions. Hear evidence? On what? Well, the law is that you don't get an injunction by getting a FERC certificate. You get an injunction by proving irreparable harm. They proved irreparable harm only on the March 15th date. It's not there. If they want to prove it another way, they can call a different witness. Well, they still do have to complete this by 2020, right? Well, that is what the FERC certificate says. Right. That is still a deadline, isn't it? Yes, sir. But you've got to get started at some point, don't you? Again, I think that's, yes, but that's the district court's decision as to whether the winter factors have been satisfied. And we are not being obstinate in insisting on an injunction for an archaeology survey. We want the surveys to happen. We have... Well, after they do those surveys and FERC is satisfied, what other rights do your client want to have to stop it? Because FERC is the gatekeeper. Once they said mitigation, archaeological limitation of the swarf that we're going to use, and they said, FERC says, it's fine with us. Do you have any other rights that could be vindicated in the court beyond that? No, but I think that's the process that's flipped. I mean, I agree with the court's description of the process, but that's what's flipped. FERC is in the middle of a process of deciding should we reroute, should we narrow the right are still in the ground undiscovered. And the chainsaws are... They're pulling the strings in the chainsaw over on one side, and over in D.C. in FERC, they're talking about, wait... So you want the district court to write a special easement in the interim for them to do what they need, but not allow them access. You don't want access that they would get on the injunction. So you want them to write a special easement. That's what has to happen. It would have to have specificity in that. That kind of micromanagement, the courts normally don't do that. If people violate their word, now we have something to say about that. You come back, we see them cutting trees, they've already represented, that's a different matter. But to micromanage, to write in, pencil in, blue pencil, a special easement in the interim short of the injunction, isn't that a bit micromanaging for the courts? Well, I would be very happy to try to avoid asking the court to do anything by entering an agreed order. And everything has changed since the hearing. I mean, you know, when you show up to litigate, they have a burden to carry. And they admit today that they didn't carry that burden. Now, if I need to work with Mr. Hatch and Mr. Holzheimer to work out something that keeps the district court out of that kind of micromanagement, I want to do it. And my clients want the historical surveys to happen. Soon. And they want FERC to know what is the historic resource and how would it be affected by this. So if we can help the district court to not micromanage that, I will do everything I can to make that happen. That is not our request here today. But I don't think that they can offer one justification, admit that it doesn't fly anymore, and then hold on to the mandatory injunction. I see my time is up, but I'd like to answer your questions if you have them. Thank you so much. Thank you. We'll come down. First, we'll ask the clerk to adjourn the court until 9.30 tomorrow morning. And then we'll come down to Greek Council. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Roger L. Gregory, William B. Traxler, Jr., Robert B. King